IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

THE UNITED STATES OF AMERICA,
    Plaintiff,

v.                                          Criminal No. CR17-00432-004(PAD)

CHRISTIAN VALLES-COLLAZO
    Defendant.

**TO THE HONORABLE PEDRO A. DELGADO-HERNANDEZ**
**UNITED STATES DISTRICT JUDGE**

# SENTENCING MEMORANDUM

DATED: February 27, 2019                        Respectfully submitted,

**S/Wilfredo Díaz-Narváez**
Wilfredo Diaz- Narvaez
USDC-PR: 215211
PO Box 31270 San Juan,
PR 00929-2270
787-759-7269
Fax: 787-753-4598
attwdn@hotmail.com

Mr. Christian Valles-Collazo respectfully submits this memorandum and the accompanying exhibits to assist the Court in its sentencing determination following his guilty plea to Count Four (4) of the Indictment charging him with conspiracy to possess with intent to distribute controlled substances.[1]

## I. PRELIMINARY STATEMENT

Mr. Christian Valles-Collazo (hereinafter "*Valles-Collazo*") Sentencing Hearing is scheduled for March 7th, 2019 at 10:00 a.m. before this Honorable Court. On September 11th, 2018, Mr. Valles-Collazo plead guilty to Count Four (4) of the Indictment, pursuant to a Plea Agreement. The purpose of this filing is to address the pertinent factors under Title 18 U.S.C. Section 3553 (a) and the applicable guidelines so that the Court may be in a better position to impose a sentence which is sufficient, but not greater than necessary to comply with the purposes set forth in this statute.

## II. INTRODUCTION & BACKGROUND

On May 21, 2014, *Valles-Collazo* was indicted for his involvement in a racketeering conspiracy where he agreed with others to assist and participate, directly and indirectly, in the conduct of the affairs of the criminal enterprise. From 2009 up until January 2014, the enterprise through a pattern of racketeering activity consisting of multiple acts, which included robbery and narcotics trafficking. In furtherance of the racketeering conspiracy, *Valles-Collazo* and the other co-conspirators committed and caused to be committed at least two overt acts.[2] Specifically, in November 20, 2012, *Valles-Collazo* along with other co-defendants, attempted to take and obtain from a person approximately $30,000.

On August 21, 2014, Valles-Collazo plead guilty in the District Court for the District of Puerto Rico; for "[a]iding and abetting in the [aforesaid] conspiracy to interfere with commerce by threat or violence: Attempted Robbery" Title 18 U.S.C. § 1951(a) and 2. Consequently, on December 17, 2014, he was sentenced in the United States District Court, San Juan, P.R. to seventy-eight (78) months of imprisonment,

---

[1] Title 21 U.S.C. §§ 841 (a)(1) and Title 21U.S.C §846
[2] Exhibit 1: United States v.Christian Valles-Collazo (14-364 DRD); Indictment; *Paragraph 7-1*.

three (3) years of supervised release and forfeiture $20,820.00 jointly and severally and any valuable asset in excess of $1,000.00.[3]

Almost three (3) years after his guilty plea, *Valles-Collazo* along with three (3) other individuals, two (2) of which were co-conspirators in case *U.S v. Valles-Collazo 14-364 (DRD)* were the subject of a second Indictment rendered by a District of Puerto Rico Grand Jury[4]. The indictment of the Case *U.S v. Valles Collazo 17-432 (PAD),* charged that "[o]n or about September 6, 2013", *Valles-Collazo* conspired to interfere with commerce by robbery in violation of Title 18 U.S.C. § 1951 and conspired to possess with intent to distribute a controlled substance in violation Title 21 U.S.C §846. For this second case *U.S v. Valles-Collazo 17-432 (PAD),* he pled guilty[5] for "[k]nowingly and intentionally possess with intent to distribute and to distribute controlled substances, to wit: in excess of five kilograms of a mixture or substance containing a detectable amount of cocaine", pursuant to the terms of the Plea Agreement.

According to the stipulation of facts, *Valles-Collazo* accepted that he possessed with intent to distribute at least two kilograms but less than three and one-half kilograms of cocaine. The Defendant admitted that he provided information concerning a potential rip to his co-defendants. Using the information that Defendant provided, the other co-defendants who were police officers, along with other individuals, robbed multiple kilograms of cocaine to sold them for profit. The co-defendants represented to have a search warrant and to be acting in an official capacity. The purpose, acts, means and methods employed by *Valles-Collazo* and the other co-defendant's were coetaneous and consistent with the allegations regarding the Count for which *Valles-Collazo* plead guilty in the case *14-364 (DRD)*.[6]

The parties agreed that *Valles-Collazo* conviction in Criminal Case No. *14-364 (DRD)* is not relevant conduct for this case, as such, the relevant conduct principle, which impacts nearly every aspect of guidelines application, can't be considered to establish the applicable offense level. However, the parties

---

[3] *See* Exhibit 2: United States v. Christian Valles-Collazo (14-364 DRD); Judgment.
[4] Mr. Valles was arrested on August 1, 2017.
[5] See Exhibit 3: United States v. Christian Valles-Collazo (17-432 PAD); Plea Agreement.
[6] See Exhibit 1: Paragraph 60 and 61.

agree to recommend that, based on the Section 3553(a) factors, the sentence in this case be imposed concurrent with Defendant's sentence in Criminal Case No. 14-364 (DRD). Accordingly, in order to impose the sentence, this honorable court may exercise its discretion in accordance with USSG §5G1.3. subsection (d) to fashion a sentence of appropriate length and structure it to run in any appropriate manner to achieve a reasonable punishment for the instant offense.

Mr. Valles Collazo accepted responsibility for the instant offense as per the plea agreement. He added that when he found out that he will become a father, the thrill and excitement was equal to his anxiety and fear about the financial future of his family. On September 13, 2013, after the born of his daughter Alanis, his Wife quit her job to take care of their daughter. However, despite that he needed money to help his family financially, he recognized that his actions did not help to solve his problems and there's no justification for what he did. He is repentant and does not want to lose more time with his loved ones.

Throughout his five (5) years of incarceration, *Valles-Collazo* has gained mindfulness and the necessary tools to return to society as a productive and responsible citizen. Far from just serve his time, *Valles-Collazo* has been doing an above average work, teaching classes to other inmates, taking courses in English, small business operation, drug abuse programs among others. *Valles-Collazo* would like that the honorable Judge take into consideration that he has accepted his wrongs and is paying for it. After his release from custody, he plans to make up for the time lost with his loved ones, especially with his daughter, who has grown up without him. He wants to rebuild his life with the unconditional love and aid of his family and friends.

### III. LEGAL FRAMEWORK & ARGUMENT

**A. To satisfy the purposes set forth in § 3553(a)(2), a sentence must be sufficient, but not greater than necessary.**

The Court, in determining the sentence to be imposed, shall consider several key issues that arise from the delicate balance between the terms "sufficient" and "necessary". In a checks and balances perspective, the criminal punishment and the pursuit of justice aim to a criminal justice system that is effective and rational. "[T]he purpose of punishment is neither to torment and afflict a sentient being, nor to undo a crime

4

already committed. The purpose of punishment ...[i]s none other than to prevent the criminal from doing fresh harm to fellow citizens and to deter others from doing the same".[7]

Unless otherwise prohibited by law, a sentencing court may consider without limitation any information concerning the background, character, and conduct of a defendant. Such information may be considered when imposing a sentence, however, as Congress acknowledged in the Sentencing Reform Act, and as the Guidelines Manual itself explicitly states, "[i]t is difficult to prescribe a single set of guidelines that encompasses the broad range of human conduct potentially relevant to a sentencing decision".[8] In words of the honorable district judge James S. Gwin: "Deterrence, incapacitation, and rehabilitation are prospective and societal – each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?"[9]

**1. Sentencing Process**

Post-Booker v. United States, 543 U.S. 220 (2005), the United States Sentencing Guidelines are advisory, not mandatory. In Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court recognized a greater latitude to district courts in imposing upon a criminal defendant the kinds of sentences that each particular case presents. In *Gall*, the United States Supreme Court overruled the decision of the Eight Circuit, which had incorrectly relied upon its earlier opinion in United States v. Clairborne, 439 F.3d 479 (8th Cir. 2006). After *Gall*, significant leeway has been accorded to district court judges who are now free to impose a sentence determined by them to be fair and reasonable after due consideration to all the factors in Title 18 U.S.C. § 3553(a)(2). Those factors in turn will guide the courts in determining whether a sentence is unreasonable. Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in § 3553(a)(2):

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

[7] Criminal Punishment and the Pursuit of Justice, Mike C. Materni, 2 Br. J. Am. Leg. Studies (2013).
[8] Ch. 1 Pt. A(1)(4)(b); §5K2.0 comment; 18 U.S.C. § 3553(b).
[9] United States v. Cole, slip op., 2008 WL 5204441 *4 (N. D. Ohio Dec. 11, 2008).

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, §3553(a) further directs sentencing courts to consider the following factors:

(1) the nature and circumstances of the offense, and the history and characteristics of the defendant;
(2) the kinds of sentences available;
(3) the need to avoid unwarranted sentence disparities among defendants with similar records, who have been found guilty of similar conduct; and
(4) the need to provide restitution to any victims of the offense.

Now well, the practical effect of *Booker* was to add a third step in the sentencing process. As such, the court's decision whether, after considering all of the factors in 18 U.S.C. § 3553(a), a sentence outside of the applicable guideline range should be imposed as a "variance." This Booker "three-step process" requires "respectful consideration" of the Guidelines Manual in all three steps:

(1) in initially calculating the sentencing range;
(2) in considering policy statements or commentary in the Guidelines Manual about departures from the guideline range; and
(3) in considering all of the § 3553(a) factors (which include the guidelines, commentary, and any relevant policy statements in the Guidelines Manual) in deciding what sentence to impose, whether within the applicable range, or whether as a departure or as a variance (or as both).

**2. Imposition of a sentence**

The Paragraph nine (9) of the Plea Agreement states as follows:

"After due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a), the parties will recommend a sentence of imprisonment of 60 months if Defendant has a Criminal History Category I-III. If Defendant has a Criminal History Category IV or higher, the parties will recommend a sentence of imprisonment at the lower end of the applicable guideline range. Although the parties agree that Defendant's conviction in Criminal Case No. 14-364 (DRD) is not relevant conduct for this case, the parties nonetheless agree to recommend that based on the Section 3553(a) factors, <u>the sentence in this case be imposed concurrent with Defendant's sentence in Criminal Case No. 14-364 (DRD)</u>"(underline supplied).[10]

To fashion a sentence of appropriate length and structure it to run in any appropriate manner to achieve a reasonable punishment for the instant offense, this court has the authority under U.S.S.G. §5G1.3 to adapt

---

[10] *See* Exhibit 3: Plea Agreement, paragraph 7, p. 3.

6

a sentence for time already served on a prior undischarged term of imprisonment, in order to achieve a reasonable punishment for the offense and comply with the statutorily defined purposes enumerated in § 3553(a)(2). In order to impose a sentence on a defendant subject to an undischarged term of imprisonment, the U.S.S.G. §5G1.3 provides that:

> (a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.
> (b) If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:
> (1) the court shall adjust the sentence for any period of imprisonment al-ready served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and
> (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.
> (c) If subsection (a) does not apply, and a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment.
> **(d) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense (emphasis supplied).**

Under subsection (d), the court may impose a sentence concurrently, partially concurrently, or consecutively to an undischarged term of imprisonment. In order to achieve a reasonable punishment for the instant offense and avoid unwarranted disparity, the court should consider the following:

> (i) the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
> (ii) the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
> (iii) the time served on the undischarged sentence and the time likely to be served before release;
> (iv) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
> (v) any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

Occasionally, the court may be faced with a complex case in which a defendant may be subject to multiple undischarged terms of imprisonment that seemingly call for the application of different rules. In such a case, **the court may exercise its discretion in accordance with subsection (d) to fashion a**

**sentence of appropriate length and structure in order to achieve a reasonable punishment.** Federal courts generally "[h]ave discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings." *See Setser v. United States, 132 S. Ct. 1463, 1468 (2012); 18 U.S.C. § 3584(a)*. Federal courts also generally have discretion to order that the sentences they impose will run concurrently with or consecutively to other state sentences that are anticipated but not yet imposed. *See Setser*, 132 S. Ct. at 1468. Exercise of that discretion, however, is predicated on the court's consideration of the factors listed in 18 U.S.C. § 3553(a), including any applicable guidelines or policy statements issued by the Sentencing Commission.

As illustration, in *USA v. Jaca-Nazario, et al. 3:03-cr-00153-CCC (2006)*, *Jaca-Nazario* claimed that the indictment in case *00153-(CCC)*, and the indictment filed in case *04-0105(PG*) involve the same conspiracy and, as such, the overacts in both cases must be considered relevant conduct. The District Court disagreed. The court determined that the criminal acts charged in each case were not related nor relevant conduct. However, **"[w]hether this conclusion has any relevance to the application of U.S.S.G. §5G1.3 is another matter" (emphasis supplied).** The Court in order to apply the dispositions of the U.S.S.G. §5G1.3 to the case explained that:

> Under said advisory guideline, the Court would be required to impose the sentence in this case consecutive to that of Criminal 04-0105(PG) if this offense was committed (1) while defendant was serving a term of imprisonment for that case, or (2) after having been sentenced in that case but before commencing the service of said term of imprisonment. U.S.S.G. §5G1.3(a). **Neither situation is applicable here.** In turn, a concurrent, adjusted sentence would have to be imposed if the offense charged in Criminal 04-0105(PG) was relevant conduct to that charged in this case and was the basis for an increase in the offense level for the instant offense. U.S.S.G. §5G1.3(b). **But since the acts charged in Criminal 04-0105(PG) did not serve as a basis to increase the offense level in this case, said condition is not present here either. Thus, the only part of U.S.S.G. §5G1.3 applicable here would be its section (c) [now section d], a policy statement**, **which permits that the sentence to be imposed in this case be made concurrently, partially concurrently, or consecutively to the sentence already imposed in Criminal 04-0105(PG)** (emphasis supplied).

In the present case, similar to *USA v. Jaca-Nazario, et al. 3:03-cr-00153-CCC (2006)*, the only applicable section of U.S.S.G. § 5G1.3. that can achieve a concurrent, fair and appropriate sentence is subsection (d). The First Circuit has recognized the ample discretion of the district courts to determine how the sentence

will be imposed under the U.S.S.G. § 5G1.3. (d). In *United States v. Jaca-Nazario, 521 F.3d 50, (1st Cir. 2008)*, *Jaca-Nazario* makes a variety of claims on appeal, among the claims, *Jaca* poised that the way that his sentence was structured constituted a "suspended sentence". The First Circuit disagreed and affirmed the discretion of the district courts to structure the sentence. The First Circuit recognized that "[t]his type of sentence, even if unusual, does not constitute a suspended sentence". In their decision, the First Circuit discussed the sentence imposed by the district court:

> **[t]he district court allowed Jaca credit against the second sentence for time he had served before the second sentencing. The second sentence was retroactively deemed to have begun at the time the first sentence began, to have been served partially concurrently therewith until the date of the second sentencing;** the remainder of the second sentence was to be served consecutively to the first sentence. At no time would Jaca be out of custody: The balance of the second sentence would commence automatically when the first sentence ended. This type of sentence, even if unusual, does not constitute a suspended sentence.

In the other hand, although the First Circuit vacated the sentences in *Jaca-Nazario, et al. 3:03-cr-00153-CCC (2006)*, the First Circuit recognized the District Court discretion to fashion a sentence under U.S.S.G. § 5G1.3. (d). On February 9, 2009, in compliance with First Circuit order, the honorable judge Carmen Cerezo Consuelo amended the judgment and sentenced the defendant to:

> ONE HUNDRED EIGHT (108) MONTHS as to counts one and three in cr 03-153 and count one in cr 04-105, **said terms to be served concurrently with each other. The defendant shall receive credit in both cases for all the time he has served since his arrest on 11/12/03, that is, the sentences shall also be served conterminously**[11] (emphasis and underline added).

In the same way, the Seventh Circuit in *U.S. v. Goudy, C.A.7 (Ill.) 1996, 78 F.3d 309* determined that under guideline governing imposition of sentence on defendant subject to undischarged term of imprisonment, district court could impose sentence which partially ran concurrently with undischarged sentence and partially ran consecutively to undischarged sentence, even though concurrent portion of new sentence was less then entire amount of sentence remaining. The Seventh Circuit indicated that application

---

[11] Coextensive in time or meaning. Black Law Dictionary 7th edition (1999). A coterminous sentence is a sentence that runs concurrently with another sentence and terminates simultaneously with the earlier imposed sentence.

note permitted court to fashion sentence which would approximate sentence that would have been imposed if sentencings had occurred at same time.

**a. The interaction between § 3553 factors and Sentencing Guideline § 5G1.3 (d) in relation to § 3585 "calculation of a term of imprisonment".**

The concurrent or consecutive decision is judicial, not executive, *Setser v. United States,132 S. Ct. 1463 (2012)*. Because the concurrent/consecutive decision is a core judicial function, the determination should not be delegated to the same Executive Branch that prosecutes the defendant. However, the Bureau of Prisons (BOP), makes precisely that decision creating *de facto* partially concurrent and consecutive sentences. When the federal court judgment is silent or ambiguous, according to BOP interpretation, the responsibility of the sentence computation will be invested in BOP. Under Title 18 U.S.C. § 3585, which provides in part that "[a] sentence commences when a defendant is received into custody at (or awaiting transport to) facility at which sentence is to be served." The BOP could essentially nullify the court determination of the appropriate punishment.

The point is illustrated by *United States v. Ross, 219 F.3d 592 (7th Cir.2000)*. In *United States v. Ross (2000),* the Seventh Circuit held that the district court had that authority: **"The computation of the total term of imprisonment for purposes of [the fifteen-year mandatory minimum] may, consistently with Application Note 2 to [U.S.S.G.] § 5G1.3, be accomplished by adding up the number of months the defendant has served on the related conviction and the number of months assessed in the federal judgment. The total must equal or exceed the statutory mandatory minimum of 180 months."** That is, the district court was permitted to impose a federal sentence as low as 146 months, as 146 months plus the 34 months that the defendant had already served in state custody would add up to 180 months. Moreover, the Seventh Circuit later observed:

> Suppose the federal statutory minimum were 10 years ...and one defendant had served 1 year of a related state sentence and another defendant 9 years. Without [such determination] the total length of imprisonment of the first defendant would be 19 years and of the second defendant 11 years; to make each defendant serve total prison time of 10 years (supposing the sentencing judge thought them equally deserving of that amount of time), the first defendant would require a 9-year reduction and the second defendant a 1-year reduction. *United States v. Cruz, 595 F.3d 744, 746 (7th Cir.2010).*

The Seventh Circuit has explained that the statutory authority to make such determination arises from § 3584, which "[g]ives a sentencing court the discretion to impose a concurrent sentence, taking into consideration the factors set forth in [18 U.S.C.] § 3553(a). *United States v. Campbell, 617 F.3d 958, 961 (7th Cir.2010); see also Cruz, 595 F.3d at 747* ("Both decisions on which Ross relied for its approach had in turn relied on the fact that in 18 U.S.C. § 3584(b) Congress had directed sentencing judges, in deciding whether to impose a concurrent or consecutive sentence, to consider the sentencing factors in 18 U.S.C. § 3553(a), which in turn incorporated the Sentencing Commission's guidelines and policy statements ... including therefore section 5G1.3(b) of the guidelines, the section on which we had relied in Ross.").

**B. Factors to be considered in imposing a term of imprisonment**

**1. The nature and circumstances of the offense and the history and characteristics of the defendant**

Mr. Valles-Collazo was born on December 16, 1985 in San Juan, P.R. He is the youngest of two children born to Héctor Valles-Gutierrez, a retired PRPD captain and a resident of Arroyo, P.R, and Odette Collazo-Mojica, a retired secretary and a resident of Davenport, Florida. His brother Héctor, age 37, resides in Cataño, P.R. and is also a PRPD Officer. He has a maternal brother, Anthony, age 27 with whom their mother resides. He also maintained a good relationship with his step father Héctor Del Valle, whis is also a retired PRPD officer. As to his upbringing, his parents separated when he was approximately 4 years-old. He was raised in a low/middle class family household, wherein all of his basic needs were provided. Notwithstanding the fact that his parents got divorced, his father was always present during his childhood. *Valles-Collazo* played baseball as a child and have parental support throughout. *Valles-Collazo* disclaimed ever being abused or neglected and never witnessed domestic violence in the household. However, his father suffers from alcoholic hepatitis due to substantial use of alcohol in the past.

Mr. Valles-Collazo has a daughter named Alanis Coral, age 5, product of his marriage with Mrs. Lizmarie Del Valle-Betancourt with whom he has been married since January 31, 2010. He deeply regrets the burden that his actions imposed on his Wife. He acknowledges that the single-parent responsibilities can be overwhelming, in particular when his daughter are most in need of support and explanation. He

described his Wife as "something beyond this world". He added that he love and understand her more than ever because his understanding of the absence. Mrs. Del Valle-Betancourt works as the Office Director for House of Representative Jose A. Banchs from the Ponce District. During his leisure time, he likes to play basketball and spend time with his family. *Valles-Collazo* have three (3) close friends who have been supporting him throughout his legal process which started in 2014. José Montes, a PRPD Police Officer whom he met in or about 2012 and worked together; Kathia Pérez, an attorney in Florida with whom he studied one year in high school and Xavier Santiago, a U.S. Army Soldier currently stationed in Korea.

His wife described him as an excellent husband and human being, as a father, she doesn't have words to describe his greatness and asserted that her parents, uncles and siblings have been very supportive of him as well. His home is located in the vicinity of San Juan, P.R. A two story home with three bedrooms, and one bathroom located in a middle class neighborhood. It is owned by his wife's grandmother. The Probation Officer who visited his home describe it as clean, organized and modestly furnished place. His wife and their 5 year old daughter reside within the home. *Valles-Collazo* mother-in-law and brother-in-law reside on the first floor

**2. Physical Health Ailments**

Mr. Valles-Collazo is a White/ Hispanic origin Male who stands 5'11" tall, weighs approximately 178 pounds, has brown eyes, and black hair. He has tattoos on both arms, and on his chest, and visible scars on his lower abdomen, due to a hernia removal and an appendectomy. The defendant has suffered from asthma for which he has taken Albuterol.

**3. Mental and Emotional Health**

The defendant has no known history of mental or emotional problems, and no history of treatment for such problems.

**4. Substance Abuse**

The defendant disclaimed the use of illegal drugs. He mentioned consuming alcohol socially while in the free community. At the time of the pretrial services interview, he exercised his right not to provide a urine sample.

## 5. Educational, Vocational and Special Skills

Mr. Valles-Collazo completed high school at Albert Einstein High School in Santurce, P.R. in 2003. He obtained an Associate Degree in Criminal Justice from the Puerto Rico Police Academy in 2004. However, he just need 15 more credits to obtain his bachelor degree in Criminal Justice. Since his incarceration in 2014, he has taken more than twenty (20) educational courses.[12] As a result of, he has obtained a certification to manage cooling systems. He also acquired culinary, business planning, workplace budgeting, among other skills. moreover, he completed a training program to become a tutor in the Metropolitan Detention center in Guaynabo, as such, he collaborates in the education of the other inmates. His progress report also showed the degree of competence in his work, the good relationship that he have with supervisors, co-workers among other significant aspects such as good attitude, punctuality, willingness to accept and complete assignments, willingness to accept supervision among others.[13] Mr. Valles-Collazo has indicated that once released from prison, he would like to complete his bachelor degree and start studying Business Administration.

## 6. Employment Record[14]

Prior his incarceration, Mr. Valles-Collazo worked as a police officer for almost ten (10) years. During this time, he received a recognition for his outstanding work in 2005. He was named the agent of the month by PRPD Drug Division in Carolina, P.R. in October 2007 and in July 2008. On February 20, 2008, *Valles-Collazo* received a recognition for his outstanding contributions due to his performance. On February 17, 2009, the *Valles-Collazo* received the honor of being chose the 2008 Investigative Agent of the year. He also received a Certificate of Appreciation from the Drug Enforcement Administration (DEA) for his outstanding contributions in the field of drug law enforcement.

## C. Current sentencing policies and practices in the federal criminal justice system.

The Title 28 § 994 imposes on the United States Sentencing the duty of "[d]evelop means of measuring the degree to which the sentencing, penal, and correctional practices are <u>effective in meeting the purposes</u>

---

[12] *See* Exhibit 4: Progress Report.
[13] *Id.*
[14] *See* Exhibit 5: Accomplishments.

13

of sentencing as set forth in section 3553(a)(2) of title 18, United States Code" and "[a]ssure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code".

**1. United States Sentencing Commission Policy Statements & Reports**

As part of its statutory authority and responsibility to analyze sentencing issues, including operation of the federal sentencing guidelines, the Commission has identified its policy priorities for the amendment cycle ending May 1, 2018.[15] Among the priorities the Commission addressed the issue of reducing costs of incarceration and overcapacity of prisons. In the same way, the Commission will continue its comprehensive, multiyear study of recidivism, including the circumstances that correlate with increased or reduced recidivism; consideration of developing recommendations to reduce incarceration costs and prison overcapacity, and to promote effective reentry programs; and consideration of appropriate guideline amendments.[16]

On the other hand, in July 2017 the USSC issued a Report regarding the impact of mandatory minimum penalties on federal sentencing. Among the key findings, the Commission noted that the USSC Mandatory minimum penalties continue to result in long sentences in the federal system.[17] As such, "[i]n fiscal year 2016, the average sentence length for offenders who were convicted of an offense carrying a mandatory minimum penalty was 110 months of imprisonment, nearly four times the average sentence (28 months) for offenders not convicted of an offense carrying a mandatory minimum penalty". Moreover, "[e]ven when such offenders receive relief from a mandatory minimum penalty, the average sentence (67 months) is still over two times greater than the average sentence for those not convicted of a mandatory minimum.

> [The Commission find that] Mandatory minimum penalties continue to have a significant impact on the size and composition of the federal prison population; [w]hile the percentage decreased slightly between 2010 and 2016, more than half (55.7%) of federal inmates in custody as of September 30, 2016 were convicted of an offense carrying a mandatory minimum penalty. Among offenders in federal prison as of September 30, 2016, 42.7 percent

---

[15] In June 2017, the Commission published a notice of proposed policy priorities for the amendment cycle ending May 1, 2018. See 82 FR 28381 (June 21, 2017). After reviewing public comment received pursuant to the notice of proposed priorities, the Commission has identified its policy priorities for the upcoming amendment cycle and hereby gives notice of these policy priorities. Final Priorities for Amendment Cycle (BAC2210-40).
[16] Id.
[17] Mandatory Minimum Penalties in the federal criminal justice system July (2017).

were convicted of an offense carrying a mandatory minimum penalty and remained subject to that penalty at sentencing, which compared to 40.4 percent as of September 30, 2010.[18]

In the same way, the abovementioned report found that "[t]he Offenses carrying a mandatory minimum penalty were used less often, as the number and percentage of offenders convicted of an offense carrying a mandatory minimum penalty has decreased since fiscal year 2010". The USSC noticed that "[j]ust over one-fifth of all offenders sentenced in fiscal year 2016 (21.9%) were convicted of an offense carrying a mandatory minimum penalty, a difference of 5.3 percentage points from fiscal year 2010 (27.2%). <u>In the District of Puerto Rico, the statistical information showed that 97.4% of the drug trafficking sentences implicated prison only, a difference of 4.8% from the national average</u>.[19]

**2. Deterrence to criminal conduct, rehabilitation, protection of the public and just punishment**

Section 3553(a)(2)(C) requires the judge to consider "the need for the sentence imposed to protect the public from further crimes of the defendant." In the same way, Section 3553(a)(2)(B) requires "[t]he need for the sentence imposed to afford adequate deterrence to criminal conduct."[20] The purpose of those Sections have to do with both the defendant's risk of recidivism and the danger posed by the defendant "[p]articularly important for those offenders whose criminal histories show repeated serious violations of the law". For example, other District Courts have found that:

> [w]here the particular defendant convicted of a [drug trafficking] offense has a low potential for recidivism, particularly where that low potential is well informed by expert evaluations and the defendant's post-arrest conduct, the defendant has no significant prior criminal history, and where the defendant appears genuinely remorseful about his crimes and aware of the harm that they cause, several courts have found little need to impose a full guideline sentence to protect the public.[21]

Regarding the aforesaid, the Sentencing Commission has published studies on recidivism showing that certain aspects of the guidelines overstate the risk of recidivism and that a number of factors that the guidelines prohibit or deem not ordinarily relevant are good predictors of reduced recidivism.

---

[18] *Id.*
[19] See Exhibit 6: Statistical Information Packet Fiscal Year 2017; District of Puerto Rico.
[20] S. Rep. No. 98-225 at 76 (1983).
[21] States v. Beiermann, 599 F. Supp. 2d 1087, 1112 *(child abuse case)* (N.D. Iowa 2009) (Bennett, J.). United States v. Perella, 273 F. Supp. 2d 162, 164 (D. Mass. 2003) (Gertner, J.).

15

## 3. First Step Act[22]

"It is in the interest of both currently incarcerated individuals and the communities to which they will eventually return to ensure we are doing everything in our power to set them up for successful reintegration into our society so that they don't commit another crime. It is very important and the right thing to do. We need workers. We need productive citizens".[23] the federal prison system is in crisis. Prior the approval of the First Step Act, the Congress established the bipartisan Charles Colson Task Force on Federal Corrections in 2014 in response to years of "[u]nsustainable prison population and cost increases, high rates of recidivism, and inaction on possible reforms." The goal was to conduct an independent assessment of the federal system and recommend reforms. The Colson Report paints a stark picture of the federal prison system, noting serious problems such as overcrowding and the lack of non-incarceration sentences. In its Executive Summary, the Colson Report notes:

> After decades of unbridled growth in its prison population, the United States faces a defining moment. There is broad, bipartisan agreement that the costs of incarceration have far outweighed the benefits, and that our country has largely failed to meet the goals of a well-functioning justice system: to enhance public safety, to prevent future victimization, and to rehabilitate those who have engaged in criminal acts. Indeed, a growing body of evidence suggests that our overreliance on incarceration may in fact undermine efforts to keep the public safe.

The First Step Act, tackle some of the harsh sentencing policies that result in higher incarceration rates, helping people maintain strong bonds despite incarceration. In that sense, current sentencing policies and practices in the federal criminal justice system sustain the sentence sought in the present case.

## IV. CONCLUSION

When asked, what have you learned during this process? *Valles-Collazo* answered that: *"The value of the family. Outside prison the freedom is always there, is free, and that's the most important thing. I have learned to understand the differences amongst people, put the reason and the truth over my desires and feelings. That understanding has given me the opportunity to help others, that's very rewarding".* Mr

---

[22] Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act
[23] See Exhibit 7: Senate Congressional Record Vol. 164 WASHINGTON, TUESDAY, DECEMBER 18, 2018 No. 199.

Valles-Collazo added that the wants to share his knowledge about the correctional system from his point of view, as a former police officer and inmate. He wants to advocate for a fairer, more humane, and more just system. *Valles-Collazo* deeply regrets the actions that brought him to the instant case. He knows that his repentance does not mean excusing, condoning, ceasing to blame, losing respect for the victims of police corruption or forgetting that a wrong-doing occurred. Instead, by recognizing his offense, he takes a first step toward a successful reentry to society and moves forward instead of dwelling on the past.

There is no reason to believe that he will commit any crimes in the future, moreover as the letters[24] submitted on his behalf overwhelmingly attest. He has been a loving father, husband and son.

We have included an excerpt of the letter of Mr. Valles-Collazo wife, Mrs. Lizmarie Del Valle:

> *About Christian I can write countless positive things and still, I can't find an answer for what's happening. An excellent human being, with very good feelings and dedicated to his work and his family. We were very united, with his family and mine… In our third attempt [to become fathers], in January 2012, I get pregnant of our daughter. It was a tense process, however, Christian was there in every appointment, test, laboratory and at our daughters birth…[I]f as a husband he was extraordinary, as a father, there is no words to describe it, his love for his daughter is endless. Everything that he does was with this unique love that he showed in his eyes and with through the lovely treat to our daughter. Since his daughter was born, the time he shared with her was sacred.*
>
> *Living far away from Christian during all of these years has been hard and painful. Even more painful has been to see Alanis grow up without his dad, attend every activity of his school and see the other children's with both parents, having to explain to their teachers that Dad is not at the moment, find an answer for her when she asks me, when is dad coming? Why he's not here?-I want that Dad come with us. Take her crying from the visits because she doesn't want to detach from him, having to look at his eyes when we have to go and feel the same sadness that he feels, but endure the desire to mourn and stay strong for her, as much as for him, among other things that I've been through during all these years.*

In the same way, his father, Mr. Hector Valles-Gutierrez, a former police captain, submitted a letter in which he stated in part that:

---

[24] See Exhibit 8: Letters.

17

> *After the [conviction] in his first case, I could not think of any reproaches toward my son, instead, I could only think on the ways I can help him and guide him as a father so he would maintain a good behavior from the first day to the last one, that he would work and study so he deserve any benefit that can be granted towards a his freedom.[Christian] has a five year old daughter that has grew up without him since she was eight months old. [Alanis] took psychological assistance in order to control her emotions since she wants her dad to be with her and question constantly why he is not with her. Is hard for her to grow up without him, visiting him in jail, full with confusion as she still grow up.*
>
> *I, as a retired police captain, I could never have imagined having to face with a son of mine trough such difficult process. I remain confident in God and that soon I will be able to have my son again and that my granddaughter will have his father in her side. Christian grew up in a family with good values, with examples to follow since his older brother is a police officer and his stepfather is also retired lieutenant form PRPD. My son desires to retake his life as a father, husband and son. Work to become a better citizen and I am committed to help him until the last day of my life.*

His friend, Mr. Jose M. Montes Otero, submitted a letter in which he stated in part that:

> *Christian Valles-Collazo is a great friend. I knew him in 2013 when he started to work in the PRPD criminal division in San Juan. At first, he was another co-worker, however, while the time passed, he became a leader, a person fully committed to his work and, above all, a great friend. We face together many situations in different places with high criminal incidence and he never say no to a job… I saw trough the time how the people who said to be his friend forget him…nowadays, I'm still in contact with him and I'm still praying for him and his family. I hope that this painful process ends quickly… [Christian] has passed a long time in the institution and I'm sure that he is fully rehabilitated with a desire to pass the page, being with his family, take advantage of the time and being a good man…I'm asking, with all my hearth for a second opportunity for [Christian] so he can return again to the community.*

His daughter, Alanis Coral Valles del Valle, has received psychological therapy. Her Doctor, Dr. Ariseldy Jimenez Ofarril, wrote a letter which certify that Alanis took the aforesaid psychological services, in the same way, throughout the letter, we can get a glimpse of the devastating impact that parental incarceration[25] has on children who are left behind:

---

[25] Although too little attention has been paid to examining the tolls of incarceration and parental separation on children of incarcerated parents, the research to date confirms what is intuitive: having a parent in prison is a hugely destabilizing

> *[A]lanis Coral Valles Del Valle was receiving psychological services in our office since September 15, 2018, for approximately three months. During that period she attended all her follow-up visits with her mother Mrs. Lizmarie del Valle-Betancourt. I was working in psychotherapy regarding the handling of emotions with the aim of stabilizing the symptoms associated with the absence of her father, since Alanis questioned the reason for which his father is absent in their home. In the same way, during this period I observed commitment to the treatment of Alanis.*
>
> *Alanis is a girl with a congestive level in accordance with the expected for their age, with good skills of socialization and communication, however, the absence of his father in his home had a significant effect on her emotional stability; resulted in significant sadness and lack of motivation in some daily tasks. In our office, we will continue working on improving the emotional health of Alanis. However we understand the importance of the presence of her father in her development, because the girl knows that her dad is alive and recognized and insisted during the process of Psychotherapy in the reintegration of her father to her home.*

The consequences that *Valles-Collazo* has already experienced are more than adequate to deter him from ever engaging in illegal conduct, and we respectfully submit that he poses no danger to the public whatsoever. He has complied with all the conditions imposed without exception. He accepts responsibility for his grave error and feels deeply ashamed for letting his family down, but most importantly for failing his daughter. He treasures his freedom and most importantly his family life.[26]

If given the opportunity, he would go back in time and amend his wrong doings in an effort to avoid the sentence that will be imposed today. *Valles-Collazo* has matured emotionally and has come to terms with his wrongdoings. He has invested his time in becoming a better person, and improve his education and

---

event in a child's life. Researchers have concluded that having an incarcerated parent can traumatize a child in the same way that abuse and domestic violence do, and with the same lasting negative impact. Unlike those other forms of loss, the impact of parental separation due to parental incarceration has been relatively underexplored. What we do know, however, is startling. Children with an incarcerated parent are more likely to face a range of health issues, from asthma and obesity to depression and anxiety. The data is especially striking for very young children ("[m]ore than 15 percent of children with parents in federal prison . . . are 4 or younger") and for children whose mothers are incarcerated. For these children, we know that the disruption of parental attachment caused by parental incarceration can sharply increase rates of depression and anxiety and severely disrupt a child's educational performance. Older children do not escape unscathed and still face serious negative impacts when a parent is incarcerated. For example, researchers have concluded that when parents are incarcerated during their children's adolescence, this separation "interrupts key developmental tasks" during the time "when parent-child relations strongly influence issues of identity." Prisoners of Fate: The Challenges of Creating Change for Children of Incarcerated Parents Amy B. Cyphert Maryland Law Review, Vol. 77 (2018).

[26] See Exhibit 9: Family pictures.

mental health. We strongly believe that if there is someone that deserves a second chance, it is Christian Valles-Collazo. As mentioned earlier, the chance of recidivism with a person like *Valles-Collazo* is low. Reintegration to society will also be easier for him, when compared to other individuals, since he has a strong family unit who are and will be supporting him.

In conclusion, according to the Sentencing Guideline Manual and pursuant to the Plea Agreement reached between the parties, we respectfully request that this honorable Court sentence Mr. Valles to 60 months of imprisonment to be served concurrently and conterminously with the sentence imposed in Criminal Case No. 14-364 (DRD). Accordingly, this court would avoid the exposure of *Valles-Collazo* to the harmful effects of over incarceration and, at the same time, will assert a core judicial function; the appropriate punishment determination. Hence, Mr. Valles-Collazo respectfully request that this honorable Court impose a sentence to be served concurrently and coterminous with all the time he has served since the imposition of the previous sentence on December 17, 2014.

**WHEREFORE,** it is respectfully requested that this Honorable Court take notice of the information provided in the present sentencing memorandum and consider it at Mr. Valles-Collazo Sentencing Hearing.

**RESPECTFULLY SUBMITTTED,** In San Juan, Puerto Rico, this 27th day of February 2019.

**CERTIFICATION OF SERVICE,** I hereby certify having filed this motion through the court's CM/ECF filing system that will notify all parties and counsel of record in this case.

**S/Wilfredo Díaz-Narváez**
Wilfredo Diaz- Narvaez
USDC-PR: 215211
PO Box 31270 San Juan, PR
00929-2270
787-759-7269
Fax: 787-753-4598
attwdn@hotmail.com